# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 40598

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENTAL RIGHTS OF JOHN (2012-16) DOE | ) ) ) | |
| IDAHO DEPARTMENT OF HEALTH AND WELFARE, | ) ) | 2013 Unpublished Opinion No. 496 |
| | ) | Filed: May 16, 2013 |
| Petitioner-Respondent, | ) ) | |
| | ) | Stephen W. Kenyon, Clerk |
| and | ) | |
| | ) | THIS IS AN UNPUBLISHED |
| GWEN DENTON, | ) | OPINION AND SHALL NOT |
| | ) | BE CITED AS AUTHORITY |
| Guardian Ad Litem-Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN (2012-16) DOE, | ) | |
| | ) | |
| Respondent-Appellant. | ) | |
| | ) | |

Appeal from the Magistrate Division of the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Carolyn M. Minder, Magistrate.

Decree terminating parental rights, affirmed.

Alan E. Trimming, Ada County Public Defender; Adam C. Kimball, Deputy Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Mary Jo Beig, Deputy Attorney General, Boise, for respondent.

Pickens Law, P.A., Boise, for Guardian Ad Litem did not participate on appeal.

LANSING, Judge

John Doe (Father) appeals from the magistrate's decree terminating his parental rights to his child, arguing the magistrate erred by finding neglect and finding that termination was in the best interests of the child. We affirm.

# I.

## FACTS AND PROCEDURE

On June 13, 2011, Father and his then seven-year-old son were residing in a homeless shelter in Boise when Father was caught "huffing" from an aerosol can. Father was arrested for intoxication by inhalation of a toxic substance, in violation of a Boise City ordinance.[1] Son was declared in imminent danger and was taken into protective custody.[2] On June 15, 2011, the Idaho Department of Health and Welfare (Department) filed a Child Protective Act (CPA) case alleging that Father's arrest and incarceration, Father's abuse of illegal substances and prescription drugs, and Father's unaddressed mental health problems left him unable to discharge his responsibilities to provide parental care and control of his child.

Father waived his right to a shelter care hearing, and an order of temporary legal custody as to the Father was entered on June 28, 2011. On July 8, 2011, Father stipulated that Son came within the jurisdiction of the CPA but did not stipulate to legal custody vesting with the Department. On July 22, 2011, a case plan pertaining to Father was filed. The case plan assigned tasks to Father to address his homelessness; safety concerns for Son arising from homelessness; Father's lack of income; Son's mental health problems; Son's medical, developmental, and educational needs; and Father's untreated mental health problems and substance abuse. On August 10, 2011, the magistrate entered orders approving the case plan and assigning legal custody of Son to the Department. Son was placed in foster care.

The magistrate held review hearings in September and December 2011. At the latter hearing, the Department and Son's guardian ad litem filed reports presenting a non-positive picture of Father's willingness to address the concerns identified in the case plan. In June 2012, a permanency review hearing was held. Submitted reports outlined Father's continuing inability and unwillingness to comply with the case plan. Nonetheless, the magistrate agreed to accommodate the Department's request to allow Father additional time to comply with the case plan. The magistrate entered an order for a short extension of foster care with a permanency plan to reunify Father and Son.

---

[1]     Father later pleaded guilty.

[2]     The child's birth mother is deceased.

In late August 2012, another review hearing was held. Because Father's inability and unwillingness to comply with the case plan persisted, the magistrate granted the Department's request to amend the permanency plan and set a hearing for September 12, 2012. At that hearing, the Department requested authorization to amend the permanency goal to termination of Father's parental rights and adoption, and further requested that the magistrate allow the Department to cease reasonable efforts to reunify Father and Son. The magistrate granted the requests and entered orders in accord. On October 11, 2012, the Department filed a petition for termination of parent-child relationship, alleging that Father had neglected Son and that termination was in the best interests of the child. Another review hearing was held on November 17, 2012.[3]

At a termination hearing in December 2012, documentary evidence was admitted and Son's foster father, a Department social worker supervisor, Son's guardian ad litem, Father's pain management physician, Father, and Father's former roommate testified concerning Father's alleged neglect and the best interests of the child. Thereafter, the magistrate entered a decree terminating Father's parental rights. Father timely appeals and asserts the magistrate court erred in its findings that he neglected Son and that the best interests of the child warrant termination of Father's parental rights.

## II.

## STANDARD OF REVIEW

The United States Supreme Court has held that a parent's interest in maintaining a relationship with his or her child is a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Quilloin v. Walcott*, 434 U.S. 246, 254-55 (1978), and the CPA directs that "the state of Idaho shall, to the fullest extent possible, seek to preserve, protect, enhance and reunite the family relationship." Idaho Code § 16-1601. Likewise, the Termination of Parent and Child Relationship Act states, "Implicit in this chapter is the philosophy that wherever possible family life should be strengthened and preserved . . . ." I.C. § 16-2001(2).

Because a fundamental liberty interest is at stake, the United States Supreme Court has determined that a court may terminate a parent-child relationship only if that decision is

---

[3]     Father failed to appear.

supported by "clear and convincing evidence." *Santosky*, 455 U.S. at 769. *See also* I.C. § 16-2009; *In re Doe*, 146 Idaho 759, 761-62, 203 P.3d 689, 691-92 (2009); *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). On appeal from a decision terminating parental rights, this Court examines whether the decision is supported by substantial and competent evidence, which means such evidence as a reasonable mind might accept as adequate to support a conclusion. *Doe v. Doe*, 148 Idaho 243, 245, 220 P.3d 1062, 1064 (2009). The appellate court will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order terminating parental rights. *Id.* at 245-46, 220 P.3d at 1064-65. The Idaho Supreme Court has also stated, however, that the substantial evidence test requires a greater quantum of evidence in cases where the trial court's finding must be supported by clear and convincing evidence, than in cases where a mere preponderance is required. *In re Doe*, 143 Idaho 343, 346, 144 P.3d 597, 600 (2006). Clear and convincing evidence is generally understood to be evidence indicating that the thing to be proved is highly probable or reasonably certain. *In re Adoption of Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006). Further, the trial court's decision must be supported by objectively supportable grounds. *Doe*, 143 Idaho at 346, 144 P.3d at 600. In our review of the record, this Court will not set aside a magistrate's findings of fact unless they are clearly erroneous. Idaho Rule of Civil Procedure 52(a); *Doe I v. Doe*, 138 Idaho 893, 906, 71 P.3d 1040, 1053 (2003). Giving due regard to the trial judge's opportunity to assess the credibility of the witnesses, we will liberally construe the trial court's finding of fact in favor of the judgment entered. *Id.* Even if a finding of fact is in error, this Court should disregard such error unless it affects the substantial rights of the parties. I.R.C.P. 61.

## III.

## ANALYSIS

A. **The Magistrate's Findings of Neglect Are Supported by Substantial and Competent Evidence**

The magistrate's decision in this case was based upon Idaho Code § 16-2005(1)(b), which provides that a parent-child relationship may be terminated when it is in the child's best interests and the parent has abused or neglected the child. As alleged in the petition in this case, a "neglected" child is defined in I.C. § 16-1602(25)(a) and (b) as a child:

> (a) Who is without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them . . . or

(b) Whose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being . . . .

A parent's performance under a case plan is relevant to a finding of neglect under Idaho Code § 16-1602(25)(a) and (b). *In re Doe 2009-19*, 150 Idaho 201, 205, 245 P.3d 953, 957 (2010). Additionally, the magistrate may consider both past and current conduct when determining whether grounds exist for terminating a person's parental rights. *State v. Doe,* 144 Idaho 839, 843, 172 P.3d 1114, 1118 (2007); *In re Doe*, 152 Idaho 953, 959, 277 P.3d 400, 406 (Ct. App. 2012).

This case began due to Father's untreated mental health problems, substance abuse, and inability to provide care and safety for his child. The magistrate found that from the initiation of the case in early June of 2011 until trial in early December of 2012, the issues which brought the child into care continued unabated, and that Father not only had failed to comply with case plan tasks which would have addressed each of these concerns but also was in denial regarding the existence of the problems themselves. Father first contends that the magistrate's findings of neglect are not supported by substantial and competent evidence.

Early in the case Father participated in a substance abuse evaluation and a mental health evaluation, reports of which were admitted into evidence at trial. These reports, coupled with trial testimony, showed that for the first seven years of Son's life Father, Son's mother, and Son resided in New Mexico. Son's mother, who did not reside with Father, had sole custody of Son and was his caregiver. Father took custody of Son in March 2010 upon Son's mother's death. In the evaluations, Father revealed that while in New Mexico he had a long history of abuse of illegal drugs including cocaine, methamphetamine, and marijuana, but Father contended that he had quit using these illegal drugs in November of 2010 when he and Son moved to Idaho so that Father could marry an Idaho woman with whom he had had a brief prior relationship. Father further said that the only time he had "huffed" inhalants was the day he was arrested in June of 2011. The magistrate found these assertions by Father that he had substantially stopped drug abuse, along with many other of his assertions, were untrue.

Trial evidence showed that Father and the woman married in December 2010 and divorced in May 2011. During this time Father was being prescribed opioids for pain caused by a lower back injury. Sometime in the spring of 2011, Father's pain management physician

discharged him from treatment because Father was abusing his prescribed medication. In April of 2011, Father was hospitalized for abuse of substances and mental health concerns. Father's ex-wife provided information to the evaluators that differed factually from Father's representations concerning his drug use during their marriage. From her representations, and because Father's numerous instances of lack of veracity on a variety of subjects, the magistrate found that Father had no credibility and further found that Father and Father's ex-wife abused illegal drugs and "huffed" together throughout their brief marriage, and that this illegal conduct had a deleterious effect on Son.

The case plan required Father to comply with recommendations of his mental health evaluator. In the mental health evaluation, Father revealed to the psychologist a long history of mental health problems and provided a list of prescribed psychotropic drugs he was purportedly taking. In the substance abuse evaluation, however, Father gave a different list of psychotropic drugs he was purportedly taking. The psychologist diagnosed Father as suffering from a number of afflictions, including depression, bipolar disorder, social phobia, and psychotic tendencies, and the psychologist recommended psychiatric counseling and medication. At trial, a social worker testified that Father had never provided any proof that he had sought or participated in mental health counseling. Father, in opposition, testified that he had, but he could not recall the doctor's name, and further testified to a new list of psychotropic drugs he was purportedly taking. Based upon the social worker's testimony and the lack of any documentary proof supporting Father's claims, the magistrate found that Father was lying and that he "never followed through with any of [the evaluating psychologist's] extensive recommendations to address his chronic mental illness. There is no evidence [Father] is taking any psychotropic medications. [Father] has not been and is not in treatment of any kind." The magistrate further concluded that Father "chooses to ignore his mental health needs" and that "there is absolutely no evidence of the veracity of [Father's] statements" that he ever took medications for his mental afflictions.

Father's substance abuse evaluation recommended substance abuse treatment, and the case plan required Father to comply with this recommendation. Based upon the testimony of a Department social worker, the magistrate found that Father started a substance abuse treatment program but did not complete it. Instead, the witness testified and the magistrate found, not only

6

was Father discharged from the program, but he also lied to the Department, contending that he had completed the program.

The case plan further required Father to submit to random urinalysis testing through a substance abuse treatment provider. The magistrate's finding that Father "did not participate in urinalysis testing" through a provider was supported by the testimony of the social worker.

The case plan further required Father to be free of illegal and non-prescribed legal substances and to not exceed prescribed levels of legal substances. At the time of his arrest, Father was seeing a new pain management physician, who testified at the trial. The magistrate found that Father had failed to disclose to his new physician that his previous pain management physician had terminated him from treatment because of prescription abuse. Based upon the new doctor's testimony and case records of Father's treatment admitted into evidence at trial, the magistrate found that during the case plan period the physician prescribed to Father the drug Oxycodone for pain and encouraged physical therapy. Father willingly took the medication but declined to participate in physical therapy. The physician testified that he prescribed the drug in amounts designed to last one week in order to discourage overuse. The physician's case records show, however, that Father consistently overused and ran out of the drug and on a regular basis called the office seeking additional amounts of the opioid before a new prescription was due. The magistrate found that the doctor ultimately discharged Father from treatment in June of 2012, due to Father's abuse of prescription drugs and "illicit drugs," as revealed by urinalysis tests by the physician that were positive for amphetamine, cocaine, and marijuana. The magistrate further found that Father then unsuccessfully attempted to revoke his consent for release of this information to the Department and that Father further lied to the Department when he denied having failed a drug test. These findings are supported by the physician's testimony, office notes, and reports.

The magistrate found that from March of 2010, when Father took custody of Son, until June of 2011, when Son was taken from Father's custody, Son and Father resided in "at least seven different places," the last of which was a homeless shelter. The magistrate found that from the initiation of the case to the end, Son attended weekly therapy sessions with a counselor to treat Son's adjustment disorder and anxiety depression caused by stress stemming from lack of stability in his living situation. This finding is supported by the social worker's, the guardian ad litem's, and Son's counselor's trial testimony. The case plan required Father to actively

7

participate in addressing Son's needs, including participation in Son's counseling appointments as directed by the Department. The magistrate found that Son's counselor, the Department social worker, and the guardian ad litem regularly encouraged Father to attend these sessions, but in the seventeen months of weekly counseling, Father attended only two sessions. These findings draw support from the testimony of those witnesses. The foster father testified, and the magistrate found, that Father only occasionally asked about Son's mental health issues. The magistrate further found that Father's trial testimony that he only attended two sessions because he was never asked or encouraged by anyone to attend these sessions was not true.

The case plan required Father to actively participate in addressing Son's medical needs. Son's foster father and the Department social worker testified, and the magistrate found, that Son suffers from Duane Syndrome, a genetic disorder that threatens the vision in his left eye and requires consistent treatment and monitoring. The foster father's testimony supports the magistrate's finding that the foster father took Son to regular appointments with an optometrist and an ophthalmologist. Son also suffered from branchio-oto-renal syndrome, a genetic disorder that causes problems with Son's ears and kidneys. Son's foster father took Son to medical appointments with an ear, nose, and throat doctor; a nephrologist; and a geneticist. The magistrate found that Son's counselor, the Department social worker, and the guardian ad litem regularly encouraged Father to attend these sessions. Father did not attend any of the appointments. The magistrate found that "while [Father] was able to identify [Son's] medical conditions and diagnoses, [Father] reported that [Son] was not receiving care or monitoring for these conditions before [Son] came into foster care." The magistrate further found that during the case plan "as to Son's ongoing medical issues, [Father] never once inquired about this subject matter or asked for additional education or information concerning the conditions." These findings draw support from the testimony of the foster father, Son's counselor, and the guardian ad litem.

The case plan also required Father to secure income to care for Son. There was no evidence that, over the course of the case plan, Father ever sought or held a job. Although Father said that he had disability income because of his mental condition, the magistrate found that Father failed to prove that he had any such income. The magistrate did note that Father testified that if he had access to Son's survivor benefits resulting from the death of Son's mother, he

8

could adequately provide income for the child. The magistrate did not find this testimony persuasive.

The magistrate found that Father "had fairly regular unsupervised and then supervised visits with [Son] during the course of the case plan and that, according to the testimony of the Department social worker, the supervised visits went "remarkably well." Even then, however, the magistrate found that Father "has been inconsistent in attending visits with [Son]" and that "when [Father] does not attend scheduled visits, [Son] is sad and cries." The magistrate found that on one occasion Father's behavior was clearly inappropriate in that Father told Son that Son's counselor was lying to Son and should not be believed. This upset Son and Father's inappropriate attempt to influence the child had to be corrected by the visitation supervisor. Testimony of the foster father, guardian ad litem, and social worker provide support for these findings.

On appeal, except for asserting that he received mental health treatment, an assertion that ignores the magistrate's findings and that misrepresents the record,[4] Father does not challenge any of the magistrate's foregoing factual findings in support of his contention that the magistrate's ultimate finding of neglect is not supported by substantial and competent evidence. He contends instead that because he submitted to a substance abuse evaluation and left substance abuse treatment on "good terms" with the provider, because it was not shown that he overused prescribed medication or illegally huffed inhalants "throughout the entire case," because he obtained housing that would be adequate for the child if they were reunited, because he attended (but did not complete) anger management and domestic/family violence programs, because he received some "love and logic" training, and because he completed a parenting class, the magistrate's finding of neglect should not be sustained. Father's stated challenges and minimal efforts toward case plan compliance do not override his substantial noncompliance with the tasks assigned to him case plan, all of which were designed to address the issues that brought Son into care. The magistrate's finding of neglect is affirmed.

---

[4]     Father asserts that because the substance abuse evaluation referred him to a specific provider for both substance abuse and mental health treatment, and because he went to that provider for a period of time, this establishes that he "engaged" in mental health treatment. The magistrate specifically and repeatedly found that while Father engaged in some substance abuse treatment at this facility, he did not engage in mental health treatment at this facility or any other. These findings are supported by testimony of the social worker.

9

**B.     The Magistrate Did Not Err in Determining Termination of Father's Parental Rights Was in the Best Interests of the Child**

Father next contends that the magistrate erred in finding that it was in the best interests of the child to terminate Father's parental rights. He does not, however, contend that any of the multitude of more specific factual findings which led to that ultimate finding are unsupported by evidence.

These unchallenged factual findings include a finding that Father and Son had no established parent-child bond, but instead Son viewed Father as more of a playmate. The magistrate also found that Son has medical conditions that require consistent monitoring and treatment, and yet Father showed no familiarity with those conditions, no interest in learning more about them, and, although Father knew of Son's conditions when he took custody, Father failed to obtain any medical treatment for the child. The magistrate further found that Son suffered from adjustment disorder and anxiety depression caused by stress stemming from his mother's death and lack of stability in his living situation since coming into Father's care (at least seven moves in eighteen months) and that Son's conditions were chronic, requiring future counseling and treatment. The magistrate found that Son "has been subjected to so many life stressors his entire life that he has been required to constantly re-adjust just to survive," but Father was uninterested in even familiarizing himself with Son's mental health issues.

The magistrate found that Son did well in foster care. With new providers and freed from his self-imposed role as caregiver to Father, he did well in school and his social skills improved. The magistrate found that Son needed a safe home with certainty and where he can feel safe; a parent who he can trust and who can answer questions; and a caregiver that can meet his medical, physical, emotional and developmental needs. The magistrate found that Father's untreated mental health and substance abuse issues rendered him unable to provide proper parental care and control of the child, or to meet Son's subsistence, medical, and emotional needs.

The magistrate found that when given the opportunity to redeem himself during the case plan period, Father exerted no effort to change and blamed others for his troubles, that Father was passive with regard to his development as a parent, and that he refused to accept personal responsibility for his lack of parenting skills. Father, wrongly, believed that it was the role of the Department and others involved in the case to help him parent his own son. Further, the magistrate found, Father was in denial and delusional regarding his life with Son, describing his

time with Son as a "Leave It to Beaver" type of life, which the magistrate found to be a "fantasy world." In essence, the magistrate found a wide gap between what Father believed to be true and the real state of things.

The guardian and the Department's social workers all opined that termination of Father's parental rights was in the child's best interests, concluding that Father was unable or unwilling to take the steps necessary to properly care for Son and to provide for his needs. The magistrate agreed, concluding:

> Based on [Father's] failure to address any of the issues which brought [Son] into care, and, based on [Father's] dishonesty and willingness to hide his substance abuse to protect himself, this Court concludes it is in [Son's] best interest to have [Father's] parent[al] rights terminated.
> [Father] has shown no interest or motivation in actually changing long-standing behavior or emotional patterns and [Father] has chosen to continue to abuse substances. It is not in [Son's] best interest to preserve the dysfunctional, dangerous, and unhealthy relationship between [Father] and [Son].

As noted above, Father does not challenge any of the magistrate's foregoing factual findings. Instead, Father asserts that because the Department social worker testified that Father's supervised visits with Son went "remarkably well overall," because Son's counselor testified that it was her opinion that Son should have "some kind of contact" with Father in the future and that perhaps there may have been other options than termination, the magistrate's finding that termination was in the child's best interests should not be sustained. Father's stated challenges do not demonstrate that the court's finding was not supported by other substantial and competent evidence in the record. The magistrate's determination that termination of the Father's parental rights was in the best interests of the child is affirmed.

## IV.

## CONCLUSION

Accordingly, the magistrate court's decree terminating the parental rights of Father is affirmed.

Judge GRATTON and Judge MELANSON **CONCUR.**

11